**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br><br>MARTEUS DEWON DENTON,<br>Defendant. | Case No. 26-cr-2032-CJW<br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |

---

**TABLE OF CONTENTS**

**Page**


***I. INTRODUCTION*** .......... **3**

***II. FINDINGS OF FACT*** .......... **5**

***A. Detective Bellis's investigation*** .......... **5**

***1. Controlled buys and traffic stop July and August 2025*** .......... **5**

***a. The controlled buys*** .......... **5**

***b. The August 6, 2025 traffic stop*** .......... **8**

***c. June 11, 2026 traffic stop*** .......... **9**

***i. Investigation at the hotel*** .......... **9**

***ii. Traffic stop*** .......... **11**

***iii. Dog sniff*** .......... **13**

***B. S.A. Austin investigation and interrogation (May and June 2026)*** .......... **17**

*III. DISCUSSION* ........ 19

*A. The Parties' Arguments* ........ 19

*B. Traffic stops* ........ 21

*1. Relevant law* ........ 21

*2. August 6, 2025 traffic stop* ........ 24

*3. June 11, 2026 traffic stop* ........ 26

*C. Dog Sniff* ........ 29

*1. Relevant law* ........ 29

*2. Whether Mako entered the vehicle* ........ 33

*3. Law enforcement had probable cause and/or reasonable suspicion without the dog sniff* ........ 34

*4. Application of the exclusionary rule* ........ 35

*D. Defendant's Statements to Law Enforcement* ........ 40

*1. Statements made after the August 2025 and June 2026 traffic stops* ........ 40

*a. Relevant law* ........ 40

*b. Application* ........ 41

*2. Statements made on June 30, 2026 to S.A. Austin* ........ 41

*a. Relevant law* ........ 41

*b. Application* ........ 44

*IV. CONCLUSION* ........ 48

## *I. INTRODUCTION*

On June 18, 2026, the Grand Jury returned an Indictment charging Defendant with two counts of Distribution of a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1), 841(b)(1)(C), and 841(b)(1)(B). (Doc. 3.) On July 21, 2026, the Grand Jury returned a Superseding Indictment charging Defendant with a total of 7 counts: one count of Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1), 841(b)(1)(A), and 846; four counts of Distribution of a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1), 841(b)(1)(C), 841(b)(1)(A), 841(b)(1)(B); and two counts of Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1), 841(b)(1)(B), and 841(b)(1)(A). (Doc. 21.)

The matter before me is Defendant's motion to suppress. (Doc. 31.) Defendant seeks to suppress evidence derived from two traffic stops. More specifically, as listed in Defendant's Inventory at Doc. 31-1, Defendant seeks to suppress:

1. Methamphetamine seized from the traffic stop on August 6, 2025;
2. Defendant's statements made during the traffic stop of August 6, 2025;
3. Defendant's statements made during the interview by Officer Ryan Bellis following the August 6, 2025 traffic stop;
4. Methamphetamine seized from the traffic stop on June 11, 2026;
5. Defendant's statements made during the traffic stop of June 11, 2026; and
6. Defendant's statements made during the interview by Detective Nicholas Berry following the June 11, 2026 traffic stop.

The Government filed a timely response. (Doc. 35.) The Honorable C.J. Williams, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation. I held a hearing on Defendant's motion to suppress on September 22, 2026. (Doc. 37.)

At the hearing, the Government's exhibits were admitted without objection:

2. Detective Ryan Bellis's body camera footage from the August 6, 2025 traffic stop;
3. Sergeant Matthew Wertz's in-car camera footage from the June 11, 2026 traffic stop;
4. Photograph of intersection at Marnie Avenue and Ridgeway Avenue;
5. Officer Jacob Bolstad's body camera Footage from the June 11, 2026 traffic stop (part 1 and part 2 identified as Exhibit 5A and 5B);
6. Still images from Officer Jacob Bolstad's body camera footage from the June 11, 2026 traffic stop;
7. Det. Nicholas Berry's body camera footage from the June 30, 2026 search warrant execution;
8. Special Agent Austin's body camera footage from the June 30, 2026 interview; and
9. Still images from Officer Bolstad's body camera.

The Government called the following witnesses:

1. Det. Ryan Bellis, Cedar Falls Police Department
2. Special Agent John Austin, Iowa Division of Narcotics Enforcement
3. Det. Nicholas Berry, Waterloo Police Department
4. Det. Mike Isley, Black Hawk County Sheriff's Office
5. Sergeant Matthew Wertz, Waterloo Police Department
6. Officer Jacob Bolstad, Waterloo Police Department

I found the witnesses credible.

Defendant offered no exhibits.

At the end of the hearing, I granted the parties' request to file post-hearing briefs. On October 6, 2026, Defendant filed his Post-Hearing Brief in Support of Defendant's

Motion to Suppress. (Doc. 38.) On October 13, 2026, the Government filed its post-hearing brief. (Doc. 39.)

For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## *II. FINDINGS OF FACT*

Det. Ryan Bellis and Special Agent John Austin conducted somewhat independent investigations of Defendant's alleged involvement in drug trafficking. While each investigator had a separate confidential source of information about Defendant, as S.A. Austin described it, "We all work in the same office. We all work closely together. We're all very well aware of each other's investigations. We talk daily about them. So everyone in the office knows what's going on with other people's investigations." (Austin Hr'g Test. at 61.) Thus, while there is some overlap in the investigations (and perhaps some question about what information was available to officers at certain times) I will explore the two strands of investigation and describe how they intertwine.

### *A. Detective Bellis's investigation*

#### *1. Controlled buys and traffic stop July and August 2025*

##### *a. The controlled buys*

Det. Bellis[1] testified regarding his experience in using confidential sources from the initial sign-up to the protocols typically employed to make controlled purchases of illegal drugs.[2] (Bellis Hr'g Test. at 10.)[3] He testified,

> We'll search that individual's person, vehicle, provide that individual with documented U.S. currency along with an audio-visual recording device.

---

[1] Det. Bellis has been employed by the City of Cedar Falls Police Department for 24 years and is currently assigned to the Tri-County Drug Enforcement Task Force.

[2] The motion is not directed at the reliability of the means used to conduct the controlled purchases. Thus, I will not repeat the protocols for each one.

[3] No transcript has been ordered. Citations to the hearing testimony are from a rough copy of the transcript provided to me as a courtesy by the court reporter.

> We'll follow the individual to the agreed meet location. We'll follow the individual away from the agreed meet location, retrieve the recording device, the suspected drugs. We'll search that person's person and vehicle once again.

(*Id.*) In 2025, Det. Bellis had been working with "CS1"[4] for about a month and learned that CS1 could acquire methamphetamine from Defendant. (*Id.* at 11.)

On July 17, 2025, CS1 arranged a controlled purchase using Facebook Messenger with "Tez Burnside," which was the name on Defendant's Facebook profile as identified by CS1. (*Id.* at 13-14.) CS1 arranged to purchase a quarter ounce of methamphetamine (or about 7 grams) for $120 at the Howard Johnson hotel in Waterloo ("the hotel"). (*Id.* at 14-15.)

Det. Bellis testified that routine controlled-purchase protocols, including appropriate searches, were followed. CS1 was provided documented[5] U.S currency and equipped with an audio-visual recording device. CS1 purchased more than 6 grams of methamphetamine from a person CS1 identified as Defendant in room 202 of the hotel. (*Id.* at 17.) These events were confirmed with the messages on CS1's Facebook Messenger account. (*Id.* at 17-18.)

Using Facebook Messenger, CS1 arranged a second controlled purchase of four ounces of methamphetamine from Defendant for $1,400 on July 24, 2025, at the same hotel using the same protocols, including surveillance of CS1's arrival at the hotel. (*Id.*

---

[4] "CS1" is my designation for clarity purposes only. "CS1" will refer to a single person who was interchangeably referred to at the hearing as a "confidential source" or a "cooperating source." (Bellis Hr'g Test. at 11-12.) CS1 was cooperating because of possession of drug charges. (*Id.* at 12.) CS1 also has a history of driving while barred and possession of drug charges. (*Id.*) Additionally, CS1 had supplied information that had been corroborated and Det. Bellis considered CS1 to be reliable. (*Id.* at 13.)

[5] Det. Bellis and S.A. Austin responded to questions about "preserialized currency," a term commonly associated with controlled purchases of illegal drugs. (Bellis Hr'g Test. at 15, Austin Hr'g Test. at 45.) U.S. currency is typically printed with a serial number I take it that "preserialized currency" means that law enforcement has documented the serial numbers on currency prior to using it so it can later be traced.

at 18-19.) However, during the transaction (as observed through the recording device on CS1) law enforcement heard Defendant report he did not have all the requested methamphetamine and would have to retrieve more from a separate source. (*Id.* at 19.) CS1 then purchased one half of the contracted amount of methamphetamine, i.e., two ounces for $700.

Defendant was observed leaving the hotel and was followed as he drove away in a black SUV. (*Id.* at 20.) Defendant traveled to an apartment complex on Lafayette Street in Waterloo where he went inside. He left the apartment complex and drove back to the hotel. (*Id.* at 20-21.) During Defendant's excursion to Lafayette Street, Det. Bellis met with CS1, retrieved the methamphetamine and the remaining $700, and received CS1's explanation of Defendant's need to acquire more methamphetamine to complete the sale. (*Id.* at 21.)

When Det. Bellis learned from other officers that Defendant had returned to the hotel, he directed CS1 to contact Defendant. (*Id.* at 22.) Defendant directed CS1 to return to the hotel to complete the transaction. The purchase of the other $700 of methamphetamine was completed at the hotel and the methamphetamine was seized by law enforcement.[6]

On August 6, 2025, investigators decided to set up a controlled purchase of a quantity that Defendant would need to travel to fulfill. (*Id.* at 25.) CS1 called Defendant and was instructed to come to the hotel because Defendant did not want to speak on the telephone. (*Id.*) When CS1 arrived at the hotel, Defendant agreed to retrieve a half pound of methamphetamine. (*Id.* at 26.) CS1 was not supplied cash to complete the transaction because it was the investigators' intention to "get Mr. Denton to leave to

---

[6] Det. Bellis testified that the Iowa Department of Criminal Investigation weighed the suspected methamphetamine received in the transactions with Defendant, tested it, and confirmed it was, in fact, methamphetamine.

retrieve the half pound and traffic stop him once it was observed that we believed he was traveling back to the hotel." (*Id.* at 26-27.) CS1 and Defendant agreed to meet back at the hotel after Defendant had retrieved the methamphetamine. (*Id.* at 27.)

Defendant then traveled in his black SUV to an address on Williston Avenue in Waterloo. (*Id.* at 28, 34.) Defendant went inside and left a short while later with a plastic bag.[7] (*Id.* at 28.)

***b. The August 6, 2025 traffic stop***

Investigators stopped Defendant as he traveled back from the Williston Avenue address to the hotel. (*Id.* at 30.) Government Exhibit 1 is labeled Gasca-Muniz In-Car Video August 6, 2025. The video depicts a black SUV being pulled over on a residential street and two officers approaching either side of the vehicle. Defendant exited the vehicle, was turned around, and handcuffed. (Gov. Ex. 1 at 19:57:16.) Defendant appeared to talk to the officers, but his statements are not audible. The officers searched Defendant's person. (*Id.* at 19:57:46-19:59:15.) Two plainclothes officers, including Det. Bellis, arrived shortly after Defendant was searched. (*Id.* at 19:59:30.)

Det. Bellis's body camera video[8] shows his interaction with Defendant beginning with such questions as "How are you?" and "where are you going to work?" while Defendant is in handcuffs. (Gov. Ex. 2 at 19:59:33-19:59:37.) Defendant stated, "You pulled me over in the wrong goddamn spot. We can't talk." (*Id.* at 20:01:26.) As Det. Bellis escorted Defendant to the rear of a police vehicle to "talk," he announced that his goal is not to take Defendant to jail but to work with him. (*Id.* at 20:01:43-20:01:49.) Defendant stated, among other things, "there's something in my car." (*Id.* at 20:02:04.) Det. Bellis told Defendant that he is not under arrest and then proceeded to read

---

[7] It was later determined that the plastic bag contained food. Methamphetamine was found in a backpack. (Bellis H'rg Test. at 36.)

[8] As discussed at the hearing, the audio on the media supplied to the Court can be heard using the VLC application but not Windows Media Player.

Defendant his *Miranda* rights. (*Id.* at 20:02:13-20:02:32.) Det. Bellis did not ask or confirm whether Defendant understood his rights. Defendant appeared to tell Det. Bellis that there is something in his duffle bag. (*Id.* at 20:02:43.)

Defendant stated that he had purchased roughly a pound of methamphetamine earlier that morning and had about 13 ounces remaining in the bag. (Bellis Hr'g Test. at 31-32.) Det. Bellis testified that he believed officers had probable to stop and search the vehicle based on the prior controlled purchases and the pending sale to CS1. (*Id.* at 33.) The stop was not based on any traffic violation. (*Id.* at 33-34.)

***c. June 11, 2026 traffic stop***

***i. Investigation at the hotel***

Det. Nicholas Berry[9] and Det. Matt Isley[10] were involved in Det. Bellis's investigation of Defendant, particularly the June 10 to June 11, 2026, incidents that led to a traffic stop. On June 10, 2026, Det. Berry was working another investigation when Det. Isely observed a silver Honda Accord belonging to Aaron Casey parked at the hotel. (Berry Hr'g Test. at 67, 72.) Det. Berry began surveillance at the hotel and observed a vehicle that he suspected was Defendant's Ford Escape. (*Id.* at 68.) Det. Berry knew Defendant worked at the hotel. (*Id.* at 82.) A short time later, Det. Isely observed Defendant's white Chevy truck pull in.[11] (*Id.* at 68.) Det. Berry saw Defendant retrieve a black backpack from the bed of the Chevy truck and walk into the hotel. (*Id.*) A short time later, a woman later identified as Alex Thiel, walked from the area where Mr. Casey

---

[9] Det. Berry has been a police officer with the City of Waterloo since 2004 and assigned to the Tri-County Drug Enforcement Task Force since 2009.

[10] Det. Isley is a detective with the Black Hawk County Sheriff's Office and assigned to the Tri-County Drug Task Force for a total of 9 years.

[11] While surveilling the hotel, Det. Berry explained that two vehicles associated with Defendant pulled into the hotel. Det. Berry recognized the black Ford Escape as a vehicle that Defendant used. Det. Isley recognized the white Chevy truck as belonging to Defendant. (Berry Hr'g Test. at 68-69.)

was parked and entered the hotel. (*Id.*) Ms. Thiel was in the hotel for 5 or 10 minutes and then exited to the area of Mr. Casey's vehicle, which pulled away. (*Id.* at 71.)

Detectives Berry and Isley observed Mr. Casey's vehicle travel to a gas station parking lot where Det. Isley saw a "window to window" interaction occur with a smaller red SUV. (*Id.* at 71-72.) This "interaction" was for a short time and occurred away from the store, consistent with a prearranged meeting. (*Id.* at 72-73; Isley Hr'g Test. at 89-90.) Det. Isley believes he saw a male subject at the passenger side of the red SUV "stick" in his hand in the vehicle and then reenter the driver's seat of the Honda. (Isley H'rg Test. at 90.)

After the Honda left the gas station it was stopped by officers who identified Aaron Casey and Alex Thiel. (*Id.* at 90-91.) The red SUV was also stopped and the driver, the sole occupant, was identified as Steve Emo. (Berry Hr'g Test. at 73-74.) Officers learned that Mr. Emo had purchased a half pound of methamphetamine from Mr. Casey. (*Id.* at 74.) Officers also learned from Ms. Thiel that she had purchased this methamphetamine from Defendant[12] and that Defendant had retrieved that methamphetamine from a black or dark-colored backpack. (*Id.* at 74; Isley Hr'g Test. at 91-93.)

Det. Berry suspected the methamphetamine had come from the black backpack he had observed Defendant carrying. (Berry Hr'g Test. at 74.) Det. Berry returned to the hotel to resume surveillance of Defendant's white truck. (*Id.* at 74-75.) Det. Berry saw Defendant interact with another person and eventually close the shades of a hotel room and leave it. (*Id.* at 75.) Defendant was carrying a black backpack that he placed in the truck bed, which he appeared to lock. (*Id.* at 75-76.)

---

[12] Ms. Thiel identified the person from whom she received narcotics by his Facebook name "Tez Burnside." (Isley H'rg Test. at 92.) Det. Isley knew this to be Defendant.

Det. Berry radioed to other officers, including Sgt. Wertz, that Det. Berry believed Defendant was involved in trafficking narcotics, that Defendant had sold methamphetamine to Ms. Thiel, and that Defendant continued to possess methamphetamine. (*Id.* at 76-77.) In addition to his observations on June 10-11[13], 2026, Det. Berry was aware of and participated in Det. Bellis's controlled purchases from Defendant and the traffic stop in 2025. (*Id.* at 80-81.) Det. Berry was also aware of S.A. Austin's controlled purchases in May 2026. (*Id.*) Det. Berry told Sgt. Wertz that he believed there was probable cause to conduct a stop regardless of a traffic violation. (*Id.* at 83.) Det. Berry testified that he does not know who asked to have a drug dog sniff Defendant's truck, but he believed there was already probable cause and "we're just always looking for more reasons to conduct that traffic stop." (*Id.* at 84.) Det. Berry requested Sgt. Wertz conduct a traffic stop of Defendant's vehicle and proceeded to the scene of the stop. (*Id.* at 77.)

***ii. Traffic stop***

Sergeant Matthew Wertz[14] of the Waterloo Police Department testified regarding his involvement in the June 10-11, 2026 traffic stop. (Wertz Hr'g Test. at 99.) The Tri-County Drug Task Force had requested officers be available to make a possible traffic stop associated with the investigation at the hotel. (*Id.*) Sgt. Wertz was told to watch for a white pickup truck with white lettering on the rear window. (*Id.*) Sgt. Wertz was parked approximately a block east of where he "saw the vehicle come out." (*Id.* at 99-100.) Sgt. Wertz observed the vehicle approach an intersection and fail to come to a complete stop at a stop sign. (*Id.* at 100, 102.) This alleged traffic violation was captured on Sgt. Wertz's dashboard camera. (*Id.* at 100; Gov. Ex. 3.)

---

[13] The surveillance and concomitant traffic stop commenced on June 10 and concluded on June 11, 2026.

[14] Sgt. Wertz has been with the WPD patrol division for over 23 years, with just more than four years as a sergeant.

The video of the alleged infraction is captured from a dashboard camera approximately a block away from the stop sign and the infraction. (*Id.* at 100.) The video clearly shows a different white pickup truck parked immediately in front of Sgt. Wertz's vehicle. This is *not* the Defendant's vehicle. In the distance above and beyond the bed of this stationary pickup, the moving lights of a vehicle are visible, consistent with Sgt. Wertz's description of the traffic violation. In the video, I can make out lights emerging from the left of the screen at 1:08:32 and traveling from left to right without coming to complete stop. (Gov. Ex. 3 at 1:08:32–1:08:41.) At 1:08:45 AM, Sgt. Wertz radioed that the truck had not stopped at the stop sign. (Wertz Hr'g Test. at 109; Gov. Ex. 3.) To be completely candid, I can only interpret what's happening with these lights based on Sgt. Wertz's explanation. However, as discussed below, his explanation is consistent with what is observable on the video. Moreover, Sgt. Wertz quickly announced his observation of the failure to stop and ultimately did pursue and stop the vehicle in question. Sgt. Wertz testified he was able to see Defendant's vehicle better in person than is depicted on the video. (*Id.* at 101-102.) Sgt. Wertz description of the failure to stop is also consistent with the photograph of the intersection in Government Exhibit 4.

At approximately 1:11 a.m., Sgt. Wertz pulled Defendant to the side of the road and told Defendant about the reasons for the stop, including the narcotics investigation. (*Id.* at 103; Gov. Ex. 3 at 1:10:28.) Defendant's pickup truck has an extended cab with two windows on each side that could be rolled down. (*Id.* at 111.) Sgt. Wertz observed that the windows of the pickup were rolled up except for the driver's side window which was rolled down. (*Id.* at 105, 111.)

#### *iii. Dog sniff*

Officer Bolstad[15] and another officer arrived very quickly after the stop. (*Id.* at 106.) Officer Bolstad was accompanied by Mako, a five-year-old, 95-pound Belgian Malinois, who is trained in article searches, tracking, apprehension, and narcotics searches. (Bolstad Hr'g Test. at 116-17.) At the time of the hearing, Mako was currently certified as a narcotics detection dog for crack cocaine, methamphetamine, heroin, ecstasy, and cocaine, and had been so for the past three years. (*Id.* at 118-19.) Officer Bolstad described pertinent aspects of Mako's training and handling including on-going training requirements, changes in behavior as he searches for the strongest source of the odor, and the other disciplines of K-9 handling such as tracking and apprehension. Officer Bolstad testified that Mako is not trained or encouraged to jump onto or into vehicles and is discouraged from such behavior. (*Id.* at 120-21, 127.) However, jumping on vehicles is significant sign that Mako has located the odor of narcotics. (*Id.* at 121-22.)

Officer Bolstad described his routine for conducting a narcotics sniff with Mako, including equipment, commands, and other details. (*Id.* at 122-23.) Officer Bolstad described innate changes in Mako's behavior that indicate the presence of narcotics, as well as the three positive indications or final alerts: sitting, lying down, or pointing. (*Id.* at 124-26.)

At the scene, Officer Bolstad removed Mako from his patrol vehicle to conduct a free air sniff for narcotics. (*Id.* at 126-27.) During his testimony, Officer Bolstad watched his body camera footage of the dog sniff and described the events. (Tr. 128-29; Gov. Ex. 5A.) Officer Bolstad described the changes in Mako's behavior that indicated

[15] Jacob Bolstad has been a patrol officer with the Waterloo police department for more than five years and a dog handler for more than three years.

to him that Mako was in the presence of narcotics odor, including bracketing, head snaps, deep breaths, and standing on his hind legs. (*Id.* at 128-29.)

The testimony is consistent that the only open window through which Mako could possibly enter the vehicle's passenger compartment was the driver's window which was partially rolled down. Thus, Mako's presence on the driver's side of the pickup is a focus of Officer Bolstad's testimony and my discussion here. Government Exhibit 6 contains a series of still images from Government Exhibit 5A which depict Mako as he stands up on his rear legs and briefly places his front paws on the driver's side of the pickup. (Gov. Ex. 5A at 1:15:57; Gov. Ex. 6.) The pickup appears to be an "extended cab" pickup truck meaning, at least in this case, the truck passenger compartment or "cab" has four doors.[16] (Bolstad Hr'g Test. at 129.) The doors can be counted as Mako circles the vehicle in the video. *See e.g.* Gov. Ex. 5A at 1:16:03, 1:16:19.

The extension of the truck's passenger compartment is important because it is clear from the video and still shots that the significant instances in which Mako jumps up on the truck in this general area are at the "seam" between passenger compartment and the truck bed. At any point where Mako jumps up on the truck he does not appear close enough to the open window to enter as Defendant contends. Officer Bolstad testified that Mako has a short snout of four or five inches stating that Mako is "not like your everyday Belgian mal where they got long snouts and long heads." (Bolstad Hr'g Test. at 140.) To the extent Mako leans into the vehicle, it appears that his nose is over the pickup bed, in the "seam," or otherwise outside the cabin. Moreover, I find credible Officer Bolstad's testimony, including his observations that Mako did not enter the windows of the cab. (*Id.* at 129, 131-32, 139-40.)

[16] A useful discussion regarding the taxonomy of pickup passenger compartments is available at https://www.motortrend.com/how-to/regular-extended-double-crew-extended-crew-cab-pickup-trucks

At 1:16:26 of Officer Bolstad's body camera footage, Mako returns to this same area by the seam on the driver's side of the pickup. While some of Mako's actions are not visible, he is again near the rear door of the pickup and not in a position to put his nose in the driver's window. Mako gave a final indication on each side of the vehicle. (Bolstad's Hr'g Test. at 135.) Officers then searched the vehicle and located suspected methamphetamine in the center console and the truck bed. (*Id.* at 136.)

On the subject of entering vehicles, Officer Bolstad acknowledged that he began trying to break Mako of the habit of "breaking the plane of windows" earlier this year. (*Id.* at 140-141.) Officer Bolstad testified:

> Q. Well, let's approach it from a different angle. So what prompted you earlier this year to start trying to keep Mako from going into windows or jumping up on vehicles? What prompted that thought?
> A. I had just heard from other handlers that in federal court if the dog breaks the plane of a window they're calling it a search, an illegal search.
> Q. Okay.
> A. So I had been from that point trying to either roll the windows up or keep him out of windows basically.

(*Id.* at 141.)

> Q. Okay. So you're not up to date on -- or you're not familiar, rather, with that case law, and you're not familiar with the case law that related to a dog's nose going through a window; is that right?
> A. Yes.
> Q. But you just took the pro active step to try to essentially curb your dog of that jumping behavior because you didn't want any problems.
> A. Correct.
> Q. At the time of the search, you didn't know whether or not there would be any problems with the nose going through the -- any particular window, did you?
> A. No.

(*Id.* at 144.)

Following the search of the vehicle and the discovery of the methamphetamine, Officer Bolstad placed Defendant in handcuffs. (Gov. Ex. 5B at 1:28:46.) While Defendant was handcuffed and before Defendant was *Mirandized* the following conversation occurred:

| | |
|---|---|
| Officer Bolstad: | Obviously you know what we found in your center console in there. |
| Defendant: | In my center console? What do you mean? |
| Officer Bolstad: | (As he walks Defendant to a patrol car) Let's walk you back here. |
| Defendant: | What are you talking about? Dude, I don't have anything in my center console. What are you talking about? |
| Officer Bolstad: | I think you're trying to play it cool but obviously you know what I found in there. |
| Defendant: | I don't know what you're talking about. |
| Officer Bolstad: | Well maybe it's hers then. I don't know. (To other officer). Is your car unlocked? |
| Defendant: | What are you talking about? |
| Officer Bolstad: | It's either a bag of coke or a bag of fentanyl. It's what I found. |
| Defendant: | Oh that's not mine, that's not mine. |
| Officer Bolstad: | Whose is it then? |
| Defendant: | That's hers. |
| Officer Bolstad: | (Unintelligible) obviously in her purse. And I don't have you under *Miranda* right now. I'm going to read that to you in a second. |

(*Id.* at 1:28:52-1:29:33.) Officer Bolstad read Defendant his rights while Defendant was handcuffed and sitting in a police vehicle and Defendant acknowledged his understanding of his rights. (*Id.* at 1:30:13-1:30:30.)[17]

[17] I have included some details about Defendant's communication with law enforcement at the two traffic stops for the sake of completeness. However, a careful reading of Defendant's briefs shows that his sole argument about the admissibility of his statements at the traffic stops is based on the alleged illegality of the stop (i.e., that they are fruit of the poison tree under the Fourth

Det. Berry arrived after suspected drugs had been located in the truck and spoke to Defendant after he had been read his *Miranda* rights. (Berry Hr'g Test. at 77-78.) Officer Bolstad coordinated a meeting between Det. Berry after advising Defendant of his *Miranda* rights. (Bolstad Hr'g Test. at 137.) Officer Bolstad then alerted Det. Berry that he had read Defendant of his rights. (*Id.*) Det. Berry was also involved in Defendant's arrest on June 30, 2026 described below.

***B. S.A. Austin investigation and interrogation (May and June 2026)***

Special Agent John Austin[18] testified regarding a separate investigation that led to Defendant. Special Agent Austin was working with CS2.[19] S.A. Austin learned in February 2026 that CS2 had been purchasing 3.5 grams of methamphetamine from Defendant at least monthly for "quite a few months." (Austin Hr'g Test. at 41-42.) Using CS2, law enforcement arranged for the purchase of methamphetamine from Defendant on May 1, 2026 at a storage unit in Waterloo. (*Id.* at 44.) Investigators conducted surveillance of the meeting at which CS2 provided documented currency in exchange for one ounce of methamphetamine. (*Id.* at 44-45.)

On May 18, 2026, S.A. Austin used CS2 to conduct another controlled purchase of one ounce of methamphetamine from Defendant for $325 at Defendant's then residence. (*Id.* at 47.) In this instance, Defendant could be clearly seen on the video of CS2's recording device weighing out methamphetamine and exchanging the methamphetamine for cash. (*Id.* at 49.)

---

Amendment). Defendant has not asserted and thus has waived any argument that the statements at the traffic stops are based on a violation of *Miranda*.

[18] S.A. Austin is a special agent in charge with the Iowa Division of Narcotics Enforcement based in Cedar Falls, Iowa since July 2026. He had previously been a Special Agent with the IDNE since 2007 and a member of the FBI task force since 2017.

[19] "CS2" is my nomenclature to distinguish this cooperator with CS1. CS2 has an OWI conviction and one drug arrest. CS2 had worked with Special Agent Austin in 2021 before restarting cooperation in 2026. (Austin Hr'g Test. at 40-41.) S.A. Austin considers CS2 generally reliable.

On June 30, 2026, after the indictment was issued in this case, law enforcement went to Defendant's residence to arrest Defendant and execute a state search warrant. (*Id.* at 50.) Defendant was found outside and in the rear of his residence and was placed in handcuffs by Det. Berry. (*Id.*; Berry H'rg Test. at 79.) Government Exhibit 7, Det. Berry's body camera video, shows Det. Berry's arrival at the Defendant's residence and his initial encounter with Defendant who was sitting in the driver's seat of a black vehicle. Det. Berry first asked about the presence of people or guns in the house. (Gov. Ex. 7 at 18:41:59-18:42:05.) Det. Berry opened the door of the vehicle and requested Defendant exit. Det. Berry, with the assistance of another officer, handcuffed Defendant after he exited the vehicle. (*Id.* at 18:42:13-18:42:44.) Defendant was asked questions about the contents of his pockets and who was in the residence while he was searched. Det. Berry walked Defendant to the back door of the residence with other officers while they discussed, primarily, the presence of Defendant's son and a dog inside and tried to induce Defendant's son to come to the door. Det. Berry advised Defendant of his *Miranda* rights at approximately 6:46 p.m. (*Id.* at 18:45:40-18:45:56; Berry Hr'g Test. at 79.) Det. Berry asked if Defendant understood his rights. (*Id.* at 18:45:50.) At this point, I can see Defendant make a slight shrug and Det. Berry repeated his inquiry. Det. Berry testified:

> Q. Did you observe Mr. Denton give you a nonverbal response when you advised him of his *Miranda* rights?
> A. I think he was well aware of what I read him. I don't recall if he, like, nodded his head or anything like that. But I didn't get the impression that he had any questions about what I just advised him of.

(Berry Hr'g Test. at 86.) At this point Defendant and the officers turned their attention to identifying Defendant's house key.

S.A. Austin did not personally advise Defendant of his *Miranda* rights, but he understood another officer had done so. (Austin Hr'g Test. at 51; Berry Hr'g Test. at

79.) S.A. Austin described how he bought Defendant food because Defendant had not eaten and S.A. Austin was concerned for his well-being. S.A. Austin's body camera[20] footage appears to begin with him handing Defendant this food. (Gov. Ex. 8.) S.A. Austin transported Defendant from Waterloo to the Linn County Jail approximately 45 minutes to an hour after law enforcement first encountered Defendant at the scene of the arrest. (Austin Hr'g Test. at 52, 57.)

S.A. Austin testified, that he had a "lengthy but brief" conversation with Defendant en route to the Linn County Jail. (*Id.* at 53.) The conversation is shown in his body camera footage. (Gov. Ex. 8). Defendant told S.A. Austin, *inter alia,* that Defendant owed a lot of money to his source and identified his source. (Austin Hr'g Test. at 53.) Defendant stated he was involved in drug trafficking, including a prior seizure of 13 pounds of methamphetamine. Defendant also described his attempted cooperation with the Tri-county Drug Enforcement Task Force. (*Id.*) S.A. Austin did not threaten, injure or make promises to Defendant. (*Id.* at 53-54.)

## *III. DISCUSSION*

### *A. The Parties' Arguments*

Defendant argues that there was no probable cause for either traffic stop. Defendant points out that there was no observed traffic violation for the August 6, 2025 stop. (Doc. 38 at 2.) Defendant argues that although officers believed he had gone to a residence to obtain controlled substances, there was no connection between that residence and drug trafficking. (*Id.* at 2-3.) Defendant further contends that the white plastic bag that officers suspected contained methamphetamine turned out to contain food. (*Id.* at 3.) Defendant believes the search should have ended at this point because the officers'

[20] The camera is evidently not on S.A. Austin's body. S.A. Austin testified that "[i]t's situated in the transport vehicle that was used to transport Mr. Denton from his residence in Waterloo to the Linn County Jail." (Austin Hr'g Test. at 52.)

suspicion had been dispelled. Furthermore, Defendant argues the search should not have continued to Defendant's backpack because he was not observed carrying it to or from the residence. (*Id.)*

Regarding the June 11, 2026 stop, Defendant contends that the failure to stop is not adequately shown on the video. (*Id.* at 3-4.) Defendant also contends that Mako inserted his nose into the open driver's window. Defendant contends that this constitutes a Fourth Amendment violation under *United States v. Handley*, 186 F.4th 563 (8th Cir. 2026). Defendant attempts to distinguish *Handley* on the basis that Officer Bolstad was aware that a dog's intrusion into a vehicle is "legally problematic." (*Id.* at 5.)

Defendant contends his statements to Det. Bellis on August 6, 2025, and the statements to Det. Berry, should be suppressed as fruit of the poisonous tree because they resulted from the alleged illegal searches of his vehicle. (*Id.* at 5-6.)

Regarding the June 30, 2026, interview by S.A. Austin, Defendant contends there is insufficient evidence that he heard or understood the warnings provided by Det. Berry. Defendant also contends that those warnings did not carry over to the later interview by S.A. Austin. Defendant relies on the change in location and change in the interviewing officer in arguing that new warnings were required. (*Id.* at 8-9.)

The Government contends that both stops were supported by reasonable suspicion or probable cause to believe that Defendant was actively engaged in drug trafficking. (Doc. 35 at 12-15.) Additionally, regarding the June 11, 2026 stop, the Government contends it also had probable cause for the stop based on Defendant's failure to stop at a stop sign. Next, the Government argues that the dog sniff did not violate Defendant's Fourth Amendment rights and constituted probable cause for the subsequent search. (*Id.* at 15-16.) Moreover, the Government contends, even without the result of Mako's sniff, law enforcement had probable cause to search Defendant's vehicle based on the narcotics investigation. (*Id.* at 16-18.) The Government maintains that the evidence does not

support Defendant's contention that Mako's nose crossed the plane of the open driver's window. (Doc. 39 at 11.) The Government also asserts that even if Mako's nose crossed the plane of the open driver's window, which the Government argues it did not, because *Handley* had not been decided at the time of the sniff, law enforcement could reasonably rely upon *United States v. Lyons,* 486 F. 3d 367 (8th Cir. 2007) in searching Defendant's vehicle because the officer's conduct was not culpable or deliberate and there was no police misconduct. (*Id.* at 18-19.)

Finally, the Government argues that Defendant's statements to officers were not the fruit of the poison tree, he was duly advised of his *Miranda* rights, and his statements were not the product of law enforcement efforts to illegally obtain statements from Defendant. (Doc. 35 at 19-21.) The Government also argues that Defendant's statements to officers on June 30, 2026 should not be suppressed because Defendant voluntarily waive his *Miranda* rights. (Doc. 39 at 16-20.)

### *B. Traffic Stops*

#### *1. Relevant law*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981); *Terry v. Ohio*, 392 U.S. 1, 9 (1968)) (internal quotations omitted). "A traffic stop constitutes a seizure for purposes of the Fourth Amendment and therefore must be supported by probable cause or reasonable suspicion." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (citing *United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012)). Officers may only conduct investigatory stops if they have reasonable suspicion that

criminal activity may be afoot. *United States v. Patrick*, 776 F.3d 951, 954 (8th Cir. 2015).

"A law enforcement officer may conduct an investigative stop of a vehicle when he [or she] has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Pounds*, 70 F.4th 1106, 1108 (8th Cir. 2023) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)); *see also United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016) ("A police officer 'may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'") (Quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Courts consider the "totality of the circumstances to determine whether an officer has a particularized and objective basis to suspect wrongdoing." *Pounds*, 70 F.4th at 1108 (citing *Arvizu*, 534 U.S. at 273). "When a team of law enforcement officers is involved in an investigation, the issue is whether all the information known to the team provided 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the investigative stop." *United States v. Collins*, 883 F.3d 1029, 1032 (8th Cir. 2018) (per curiam) (quoting *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007), in turn quoting *United States v. Robinson*, 119 F.3d 663, 666 (8th Cir. 1997)). In other words, "[r]easonable suspicion requires an officer to be 'aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed based on the totality of the circumstances.'" *United States v. Drayton*, 181 F.4th 906, 911 (8th Cir. 2026) (quoting *United States v. Merrett*, 8 F.4th 743, 750 (8th Cir. 2021)).

In general, the reasonable suspicion standard "is 'less demanding' than probable cause and much lower than preponderance of the evidence." *United States v. Callison*,

2 F.4th 1128, 1132 (8th Cir. 2021) (citing *Wardlow*, 528 U.S. at 123). In *Alabama v. White*, 496 U.S. 325 (1990), the Supreme Court explained that:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Adams v. Williams* . . . demonstrates as much. We there assumed that the unverified tip from the known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a *Terry* stop. 407 U.S. at 147. . . . Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.

*White*, 496 U.S. at 330.

Furthermore, "[t]he collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers." *United States v. Rederick*, 65 F.4th 961, 966 (8th Cir. 2023) (quoting *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008)); *see also United States v. Jacobsen*, 391 F.3d 904, 907 (8th Cir. 2004) ("The patrol officer himself need not know the specific facts that caused the stop . . . [r]ather, the officer need only rely upon an order that is founded on reasonable suspicion.").

Additionally, in the context of traffic violations, a police officer may stop a vehicle only when the officer has "'at least a reasonable, articulable suspicion that criminal

activity has occurred or is occurring,' and 'a traffic violation—however minor—creates probable cause to stop the driver of a vehicle.'" *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021) (quoting *United States v. Martin*, 411 F.3d 998, 1000 (8th Cir. 2005)). Generally, a traffic stop "is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). A minor traffic violation is sufficient to establish probable cause for an officer to conduct a traffic stop even if the stop is pretext for another investigation. *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007) (quoting *United States v. Coney*, 456 F.3d 850, 855-56 (8th Cir. 2006)). An officer's actual motivation for making the stop beyond simply issuing a traffic violation is irrelevant provided that the officer has an objectively good reason for making the stop. *Id.*

Further, in *United States v. Wells*, the Eighth Circuit Court of Appeals articulated probable cause for searching a vehicle during a lawful traffic stop:

> "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000). . . . "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). "[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam).

347 F.3d 280, 287-88 (8th Cir. 2003).

***2. August 6, 2025 traffic stop***

Law enforcement had reasonable suspicion to perform an investigatory stop on August 6, 2025, and had probable cause to search Defendant's vehicle. On June 17,

2025 and July 24, 2025, law enforcement conducted controlled drug transactions with Defendant. These controlled transactions resulted in law enforcement seizing more than 110 grams of methamphetamine. On August 6, 2025, CS1 arranged a third controlled drug transaction for the purchase of a half pound of methamphetamine. CS1 was wearing an audio/video recording device while discussing the purchase of the half pound of methamphetamine which allowed law enforcement to listen to the discussion. CS1 advised Defendant that they needed to obtain money to complete the drug transaction. CS1 and Defendant left the hotel. CS1 informed Det. Bellis that Defendant needed to obtain the methamphetamine for the controlled transaction. Law enforcement surveilled Defendant after he left the hotel and observed him travel to a residence on Williston Avenue. Law enforcement observed Defendant leave the residence after a short period of time carrying a white bag. Law enforcement also observed Defendant driving back to the hotel where CS1 and Defendant had set up the purchase.

Based on the totality of the circumstances set forth above, I find that law enforcement had a particularized and objective basis for suspecting that Defendant was engaged in criminal activity, *i.e.*, obtaining methamphetamine to sell to CS1. *See Pounds*, 70 F.4th at 1108. Thus, law enforcement had reasonable suspicion to conduct the investigatory stop of Defendant's vehicle on August 6, 2025.

Furthermore, Defendant's arguments that: (1) there was "no known connection" between the Williston Avenue residence and drug trafficking; and (2) the "search should have ended" after food was found in the white bag Defendant carried from the residence because "officers' suspicion had been dispelled," are both unpersuasive. (Doc. 38 at 3.) First, regardless of whether the Williston Avenue residence had a history of drug trafficking, law enforcement had strong evidence to believe that Defendant was leaving the hotel to obtain methamphetamine to sell to CS1. Law enforcement observed Defendant at the residence for a short period of time and then leave and travel back

towards the hotel. Under these circumstances, law enforcement had reasonable suspicion to stop Defendant's vehicle and probable cause to search the vehicle because it was reasonable for law enforcement to believe that there was a "fair probability that contraband or evidence of a crime would be found in" the vehicle. *See Fladten*, 230 F.3d at 1085; *see also Pounds*, 70 F.4th at 1108 (law enforcement had a particularized and objective basis for suspecting Defendant was engaged in criminal activity). Second, based on the foregoing, searching the white bag and only finding food in it did not dispel officers' reasonable belief that contraband, *i.e.*, methamphetamine, would be found in the vehicle.

Accordingly, based on the totality of the circumstances, I find that law enforcement had reasonable suspicion to conduct an investigatory stop on Defendant's vehicle and had probable cause to search the vehicle. Therefore, I recommend that the Court deny Defendant's motion to suppress as it pertains to the August 6, 2025 traffic stop.

***3. June 11, 2026 traffic stop***

Law enforcement had probable cause to stop Defendant's vehicle based on Sgt. Wertz's observation of Defendant failing to stop at a stop sign. *See Cox*, 992 F.3d at 709 (providing that a police officer may stop a vehicle only when the officer has "'at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring,' and 'a traffic violation—however minor—creates probable cause to stop the driver of a vehicle'") (quoting *Martin*, 411 F.3d at 1000). Sgt. Wertz was requested to stop Defendant for drug trafficking. Sgt. Wertz was parked approximately a block east of where he first observed Defendant's vehicle. Sgt. Wertz observed the vehicle approach an intersection and fail to come to a complete stop at a stop sign. This alleged traffic violation was captured on Sgt. Wertz's dashboard camera. (Gov. Ex. 3.) As discussed above, in the video one can see lights emerging from the left of the screen at

1:08:32 and traveling from left to right without coming to complete stop. (Gov. Ex. 3 at 1:08:32–1:08:41.) I find Sgt. Wertz credible and his explanation of what occurred is consistent with what is observable on the video. Further, at 1:08:45 AM, Sgt. Wertz immediately radioed that the truck had not stopped at the stop sign. (Wertz Hr'g Test. at 109; Gov. Ex. 3.) Thus, there is no basis to conclude Sgt. Wertz's stated reason for the stop was later fabricated. Sgt. Wertz also testified he was able to see Defendant's vehicle better in person than it is depicted on the video. (*Id.* at 101-102.) Moreover, Sgt. Wertz's description of the failure to stop is also consistent with the photograph of the intersection in Government Exhibit 4. Thus, based on the totality of the circumstances, I find Sgt. Wertz had probable cause to believe that a traffic violation occurred—Defendant's failure to stop at the stop sign—and the stop did not infringe on Defendant's Constitutional rights. *See Wren*, 517 U.S. at 810 (finding that a traffic stop "is reasonable where the police have probable cause to believe that a traffic violation has occurred"); *Sallis*, 456 F.3d at 649 (providing that a traffic violation is sufficient to establish probable cause to conduct a traffic stop even in the stop is pretext for another investigation). Accordingly, I recommend that the Court deny Defendant's motion to suppress based on his argument that the June 11, 2026 traffic stop lacked probable cause. *See* Doc. 38 at 3-4.

Even without the traffic violation, Sgt. Wertz had reasonable suspicion to conduct an investigatory stop of Defendant's vehicle. On June 10, 2026, law enforcement conducted surveillance at the hotel. Detectives observed a silver Honda in the hotel parking lot. Detectives also observed Defendant's white Chevy truck pull into the hotel parking lot. Defendant retrieved a black backpack from the truck and entered the hotel. Alex Thiel was observed entering the hotel, and after five to ten minutes returned to the area of the silver Honda. Detectives observed the Honda pull away. Law enforcement surveilled the Honda and followed it to a gas station where Detectives observed a window-

to-window transaction with a red SUV. Detectives Berry and Isley both testified that the interaction was consistent with a prearranged meeting. (Berry Hr'g Test. at. 72-73; Isley Hr'g Test. at 89-90.) Law enforcement stopped the Honda and the red SUV. Law enforcement learned from the driver of the red SUV that he had purchased a half pound of methamphetamine from the driver of the Honda. Ms. Thiel, who was a passenger in the Honda, informed law enforcement that she had purchased methamphetamine from Defendant and that Defendant had retrieved the methamphetamine from a black backpack. Law enforcement returned to the hotel to watch Defendant's truck. Det. Berry observed Defendant exit the hotel carrying a black backpack, which Defendant placed in the truck bed. Det. Berry radioed to other officers, including Sgt. Wertz, that Det. Berry believed Defendant was involved in trafficking narcotics, that Defendant had sold methamphetamine to Ms. Thiel, and that Defendant continued to possess methamphetamine. (Berry Hr'g Test. at 76-77.) In addition to his observations on June 10-11, 2026, Det. Berry was aware of and participated in Det. Bellis's controlled purchases from Defendant and the traffic stop in 2025. (*Id.* at 80-81.) Det. Berry was also aware of S.A. Austin's controlled purchases in May 2026. (*Id.*) Det. Berry told Sgt. Wertz that he believed there was probable cause to conduct a stop regardless of a traffic violation. (*Id.* at 83.)

Based on the totality of the circumstances set forth above, I find that law enforcement had a particularized and objective basis for suspecting that Defendant was engaged in criminal activity, *i.e.*, possessing and selling methamphetamine. *See Pounds*, 70 F.4th at 1108; *see also Rederick*, 65 F.4th at 966 ("The collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers.")

(Quotation omitted). Thus, law enforcement had reasonable suspicion to conduct the investigatory stop of Defendant's vehicle on June 11, 2026.

Accordingly, I recommend that the Court deny Defendant's motion to suppress as it pertains to the June 11, 2026 traffic stop.

### *C. Dog Sniff*

#### *1. Relevant law*

The Fourth Amendment protects persons against unreasonable searches and seizures. U.S. Const. amend. IV. Warrantless searches are per se unreasonable, with a few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Id.* at 1140-41 (citations omitted); *see also United States v. Castaneda*, 438 F.3d 891, 893 (8th Cir. 2006) ("The warrantless search of a vehicle is constitutional pursuant to the automobile exception to the warrant requirement, if law enforcement had probable cause to believe the vehicle contained contraband or other evidence before the search began.") (Quotation omitted). The burden is on the Government to justify a warrantless search. *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984).

In *United States v. Wells*, the Eighth Circuit articulated probable cause for searching a vehicle during a lawful traffic stop:

> "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000). . . . "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). "[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on

> the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam).

347 F.3d 280, 287-88 (8th Cir. 2003).

A dog sniff of the exterior of a vehicle during a stop does not violate the Fourth Amendment. *United States v. Rivera*, 570 F.3d 1009, 1012 (8th Cir. 2009) (citing *Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005)). "[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle." *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010); *see also United States v. Holleman*, 743 F.3d 1152, 1157 (8th Cir. 2014) (providing that "the handling officer testified [his dog] gave two definitive 'alerts' to the side of [the defendant's] truck" and "[a]s a result, we are not concerned about [the dog's] failure to give a full indication"); *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999) (holding that the positive indication of a reliable drug dog, alone, is enough to establish probable cause). A drug dog is considered reliable when it has been "trained and certified to detect drugs and a detailed account of the dog's track record or education is unnecessary." *United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007) (citation omitted). In explaining what is necessary to prove a dog's reliability the Supreme Court stated:

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

*Florida v. Harris*, 568 U.S. 237, 246-47 (2013). The standard to establish probable cause "is no more demanding where police search an automobile based on probable cause without a warrant." *Olivera-Mendez*, 484 F.3d at 512. However, the court must also consider evidence that may detract from the dog's reliability. *See Winters*, 600 F.3d at 967 ("Contrary evidence 'that may detract from the reliability of the dog's performance properly goes to the credibility of the dog.'") (Quoting *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994)). The relevant question is "whether all the facts surrounding a dog's alert [or indication], viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 248.

However, if a dog enters the interior of a defendant's vehicle, even the nose of a dog crossing the plane of an open car window, a trespass occurs and the sniff amounts to a search. *Handley*, 186 F.4th at 568. The Eighth Circuit explained that:

> Nearly 20 years ago, we held that "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." *United States v. Lyons*, 486 F.3d 367, 373 (8th Cir. 2007). We determined that a dog's intrusion into the open window of a vehicle during a drug sniff, where law enforcement did not direct or encourage the behavior, did not violate the Fourth Amendment. *See id*. However, [the defendant] argues that two intervening Supreme Court decisions — *United States v. Jones*, 565 U.S. 400, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) and *Florida v. Jardines*, 569 U.S. 1, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013) — have since undermined our decision in *Lyons*.
>
> In *Jones*, the Supreme Court held the Fourth Amendment applies when law enforcement "physically occupie[s]" a vehicle "for the purpose of obtaining information." 565 U.S. at 404–05, 132 S.Ct. 945. There, the Court determined a search occurred when the government attached a GPS device to the exterior of a vehicle. *Id*. at 403–04, 132 S.Ct. 945. And in *Jardines*, the Court concluded that a search occurred when law enforcement led a drug dog onto the curtilage of a person's home, where it alerted to the presence of narcotics. 569 U.S. at 4–6, 11–12, 133 S.Ct. 1409. In reliance

> on this alert, law enforcement obtained a search warrant for the home and ultimately discovered marijuana. *Id.* at 4, 133 S.Ct. 1409. The Court determined a search occurred and suppressed the evidence because law enforcement "learned what they learned only by physically intruding on Jardines' property to gather evidence. . . ." *Id.* at 11, 133 S.Ct. 1409 (emphasis added).
>
> The government argues [the dog's] actions do not fall within the scope of *Jones* or *Jardines*. Instead, they argue *Lyons* still controls because the officers did not prompt [the dog] to enter [the defendant's] vehicle, meaning [the dog] acted instinctively and therefore did not violate [the defendant's] Fourth Amendment rights. We disagree.
>
> We decided *Lyons* before *Jones* and *Jardines*. And until now, we have not needed to resolve whether *Lyons* holds up in light of these intervening decisions. *See Pulido-Ayala*, 892 F.3d at 318–19 (reserving this question). Taken together, *Jones* and *Jardines* make clear that when the government, including its dogs, trespasses onto private property for the purpose of gathering information, a search occurs. *See Jones*, 565 U.S. at 404–05, 132 S.Ct. 945; *Jardines*, 569 U.S. at 10–11, 133 S.Ct. 1409 (rejecting Florida's argument that a drug dog's trespassory sniff was not a search under *Caballes*). The test is objective — all that matters is whether "the [g]overnment physically occupied private property for the purpose of obtaining information." *Jones*, 565 U.S. at 404, 132 S.Ct. 945. And this simply cannot be squared with *Lyons's* holding that "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." *Lyons*, 486 F.3d at 373.
>
> Here, [the defendant] did not authorize the government to enter his vehicle. Thus, a trespass occurred when [the dog] stuck her snout through the window of [the defendant's] vehicle. *See Jones*, 565 U.S. at 404–05, 132 S.Ct. 945. This trespass occurred during a drug sniff, which was obviously aimed at gathering information regarding whether narcotics were present in [the defendant's] vehicle. Because [the dog], an instrumentality of the government, trespassed into [the defendant's] vehicle to obtain information, her sniff amounted to a search. *See Pulido-Ayala*, 892 F.3d at 318 ("A drug dog is an instrumentality of the police. . . .").

*Handley*, 186 F.4th at 568-69.

### 2. *Whether Mako entered the vehicle*

Contrary to Defendant's argument that Mako "inserted his nose into the open driver's window of the vehicle," I find that the evidence does not support this assertion. Defendant is correct that the only open window was the driver's window. Government Exhibit 6 contains a series of still images from Government Exhibit 5A that depict Mako as he stands up on his rear legs and briefly places his front paws on the driver's side of the pickup. (Gov. Ex. 5A at 1:15:57; Gov. Ex. 6.) The pickup is an "extended cab" pickup truck. (Bolstad Hr'g Test. at 129.) The extension of the truck's passenger compartment is important because it is clear from the video and still shots that the significant instances in which Mako jumps up on the truck in this general area are at the "seam" between passenger compartment and the truck bed. At any point where Mako jumped up on the truck he does not appear close enough to the open window to enter as Defendant contends. To the extent Mako leaned into the vehicle, it appears that his nose is over the pickup bed, in the "seam," or otherwise outside the cabin. Moreover, I find credible Officer Bolstad's testimony, including his observations that Mako did not enter the windows of the cab. (*Id.* at 129, 131-32, 139-40.) At 1:16:26 of Officer Bolstad's body camera footage, Mako returns to this same area by the seam on the driver's side of the pickup. While some of Mako's actions are not visible, he is again near the rear door of the pickup and not in a position to put his nose in the driver's window. Based on the foregoing, I conclude that Mako did not insert his nose in any window of the truck, and therefore, no Fourth Amendment violation occurred.

Accordingly, I recommend that the Court deny Defendant's motion to suppress as it pertains to Mako's snout crossing the plane of the driver's window.

### *3. Law enforcement had probable cause and/or reasonable suspicion without the dog sniff*

Even without the dog sniff, law enforcement had probable cause to search Defendant's vehicle. As discussed above, on June 10, 2026, law enforcement conducted surveillance at the hotel. Detectives observed a silver Honda in the hotel parking lot. Detectives also observed Defendant's white Chevy truck pull into the hotel parking lot. Defendant retrieved a black backpack from the truck and entered the hotel. Alex Thiel was observed entering the hotel, and after five to ten minutes returned to the area of the silver Honda. Detectives observed the Honda pull away. Law enforcement surveilled the Honda and followed it to a gas station where Detectives observed a window-to-window transaction with a red SUV. Detectives Berry and Isley both testified that the interaction was consistent with a prearranged meeting. (Berry Hr'g Test. at. 72-73; Isley Hr'g Test. at 89-90.) Law enforcement stopped the Honda and the red SUV. Law enforcement learned from the driver of the red SUV that he had purchased a half pound of methamphetamine from the driver of the Honda. Ms. Thiel, who was a passenger in the Honda informed law enforcement that she had purchased methamphetamine from Defendant and that Defendant had retrieved the methamphetamine from a black backpack. Law enforcement returned to the hotel to watch Defendant's truck. Det. Berry observed Defendant exit the hotel carrying a black backpack, which Defendant placed in the truck bed. Det. Berry radioed to other officers, including Sgt. Wertz, that Det. Berry believed Defendant was involved in trafficking narcotics, that Defendant had sold methamphetamine to Ms. Thiel, and that Defendant continued to possess methamphetamine. (Berry Hr'g Test. at 76-77.) In addition to his observations on June 10-11, 2026, Det. Berry was aware of and participated in Det. Bellis's controlled purchases from Defendant and the traffic stop in 2025. (*Id.* at 80-81.) Det. Berry was also aware of S.A. Austin's controlled purchases in May 2026. (*Id.*)

Based on the foregoing, law enforcement had probable cause to search Defendant's truck because it was reasonable for law enforcement to believe that there was a "fair probability that contraband or evidence of a crime would be found in" the vehicle, *i.e.*, methamphetamine. *See Fladten*, 230 F.3d at 1085; *see also Pounds*, 70 F.4th at 1108 (law enforcement had a particularized and objective basis for suspecting Defendant was engaged in criminal activity).

Accordingly, I recommend that the Court deny Defendant's motion to suppress as it pertains to the June 11, 2026 vehicle search.

***4. Application of the exclusionary rule***

In *Davis v. United States*, 564 U.S. 229 (2011), the Supreme Court addressed the issue of whether to apply the exclusionary rule "when the police conduct a search in compliance with binding precedent that is later overruled." *Id.* at 232. The Supreme Court held that a "search conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Id.* The Supreme Court noted that in "a line of cases beginning with [*United States v.*] *Leon*, 468 U.S. 897 [(1984)], we . . . recalibrated our cost-benefit analysis in exclusion cases to focus the inquiry on the "flagrancy of the police misconduct" at issue." *Davis*, 564 U.S. at 238. The Supreme Court stated:

> The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion "var[y] with the culpability of the law enforcement conduct" at issue. *Herring* [*v. United States*], 555 U.S. [135,] 143, 129 S.Ct. 695 [(2009)]. When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. *Id.*, at 144, 129 S.Ct. 695. But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful, *Leon*, *supra*, at 909, 104 S.Ct. 3405 (internal quotation marks omitted), or when their conduct involves only simple, "isolated" negligence, *Herring*, *supra*, at 137, 129 S.Ct. 695, the " 'deterrence rationale loses much of its force,'" and exclusion cannot "pay its way," *Leon*, *supra*, at 919, 908, n. 6, 104 S.Ct.

3405 (quoting *United States v. Peltier*, 422 U.S. 531, 539, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975)).

*Id*. The Supreme Court explained that:

> The question in this case is whether to apply the exclusionary rule when the police conduct a search in objectively reasonable reliance on binding judicial precedent. . . . Although the search turned out to be unconstitutional under *Gant*, all agree that the officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way. . . .
>
> Under our exclusionary-rule precedents, this acknowledged absence of police culpability dooms Davis' claim. Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield "meaningfu[l]" deterrence, and culpable enough to be "worth the price paid by the justice system." *Herring*, 555 U.S., at 144, 129 S.Ct. 695. The conduct of the officers here was neither of these things. The officers who conducted the search did not violate Davis' Fourth Amendment rights deliberately, recklessly, or with gross negligence. *See ibid*. Nor does this case involve any "recurring or systemic negligence" on the part of law enforcement. *Ibid*. The police acted in strict compliance with binding precedent, and their behavior was not wrongful. Unless the exclusionary rule is to become a strict-liability regime, it can have no application in this case.
>
> Indeed, in 27 years of practice under *Leon*'s good-faith exception, we have "never applied" the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct. *Herring*, *supra*, at 144, 129 S.Ct. 695. . . .
>
> Responsible law enforcement officers will take care to learn "what is required of them" under Fourth Amendment precedent and will conform their conduct to these rules. *Hudson* [*v. Michigan*], 547 U.S. [586,] 599, 126 S.Ct. 2159 [(2006)]. But by the same token, when binding appellate precedent specifically authorizes a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities. An officer who conducts a search in reliance on binding appellate precedent does no more than "'ac[t] as a reasonable

> officer would and should act'" under the circumstances. *Leon*, 468 U.S., at 920, 104 S.Ct. 3405 (quoting *Stone* [*v. Powell*], 428 U.S. [465,] 539–540, 96 S.Ct. 3037 [(1976)] (White, J., dissenting)). . . .
>
> We have stated before, and we reaffirm today, that the harsh sanction of exclusion "should not be applied to deter objectively reasonable law enforcement activity." [*Leon*, 468 U.S.] at 919, 104 S.Ct. 3405. Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.

*Id.* at 239-41 (first and fifth alteration in original); *see also United States v. Robinson*, 781 F.3d 453, 458-59 (8th Cir. 2015) ("Thus, even if a . . . search is unconstitutional, the evidence is admissible if the agents acted in objectively reasonable reliance on binding appellate precedent"); *United States v. Davis*, 760 F.3d 901, 905 (8th Cir. 2014) ("When the police comply with authoritative precedent, only to see the law evolve after the fact, there is nothing to deter; the police cannot modify their conduct to accord with cases not yet decided") (quotation omitted); *United States v. Barraza-Maldonado*, 732 F.3d 865, 869 (8th Cir. 2013) ("Officers should not be faulted for adhering to existing precedent until that precedent is authoritatively overruled.").

In *Handley*, a case where, during a dog sniff, the dog's snout entered a vehicle through an open window, the Eighth Circuit determined that under the Supreme Court's *Davis* decision, discussed at length above, the exclusionary rule did not apply. The Eighth Circuit explained that:

> First, *Lyons* held that "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." 486 F.3d at 373. Handley argues this language is dicta because the court alternatively held the search was reasonable based on the inevitable discovery doctrine. *See id.* at 373–74. But when courts give two alternative reasons for their conclusions, "neither can be considered obiter dictum. . . ." *Sutton v. Addressograph-Multigraph Corp.*, 627 F.2d 115, 117 n.2 (8th Cir. 1980) (quoting *Kushner v. Winterthur Swiss Ins. Co.*, 620 F.2d 404, 408 n.4 (3d Cir. 1980)).

> Second, neither *Jones* nor *Jardines* explicitly overruled *Lyons*. And a reasonable officer would not be expected to realize that either case implicitly overruled *Lyons*, as neither case involved a drug dog's instinctive actions. It is true that we questioned *Lyons's* validity after *Jones* and *Jardines*. But before today, we declined to resolve the issue. *See Pulido-Ayala*, 892 F.3d at 319 (noting that "[t]here is reason to doubt . . . whether the district court's reading of the *Lyons* cases endures" but ultimately declining to decide the issue and resolving the case on other grounds). So we think the officers here could have reasonably relied on *Lyons* in determining Lara's unprompted entry into Handley's vehicle did not violate his Fourth Amendment rights. *See Davis*, 564 U.S. at 241, 131 S.Ct. 2419 ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule."). . . .
>
> Consequently, the district court did not err when it decided not to apply the exclusionary rule.
>
> Because the law enforcement officers here reasonably relied on *Lyons* when they searched Handley's vehicle, the district court did not err when it denied Handley's motion to suppress.

*Handley*, 186 F.4th at 569-70.

Additionally, "[t]o determine whether officers objectively and reasonably relied on binding precedent in conducting a search, courts evaluate whether the officers acted in strict compliance with then-binding Circuit law." *United States v. Robinson*, 903 F.Supp.2d 766, 805 (E.D. Mo. 2012) (quotation omitted). "Lower courts, accordingly, when applying *Davis*, have looked to officers' compliance with, not knowledge of, binding appellate precedent." *United States v. Amaya*, 853 F.Supp.2d 818, 829 (N.D. Iowa 2012), *withdrawn in part on other grounds*, 853 F.Supp.2d 835 (N.D. Iowa 2012).

Here, even if Mako's nose did cross the plane of the open driver's window of Defendant's truck, it is indisputable that the officers in this case did not violate Defendant's Fourth Amendment rights deliberately, recklessly, or with gross negligence.

*See Davis*, 564 U.S. at 240. Because at the time of the search of Defendant's vehicle *Lyons* remained good law, as *Lyons* was not overruled until August 11, 2026, by *Handley*, "an officer who conducts a search in reliance on binding appellate precedent does no more than ac[t] as a reasonable officer would and should act under the circumstances." *Id.* at 241 (alteration in original) (quotation omitted). Thus, law enforcement could rely on *Lyons's* holding that "[a]bsent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." 486 F.3d at 373. Therefore, following *Davis*, I find that even if Mako's nose broke the plane of Defendant's vehicle's window which would constitute a trespass and an unreasonable and illegal search, the exclusionary rule should not be applied as *Lyons* remained good law and Officer Bolstad and the other officers acted in compliance with *Lyons*. *See Davis*, 564 U.S. at 241 ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.").

To the extent that Defendant contends that *Handley* is distinguishable because Officer Bolstad testified that "he was not aware of the prior case law and was aware that a dog inserting himself into a vehicle and/or jumping on a vehicle is problematic" and was attempting to train and restrain Mako from entering vehicles, *see* Doc. 38 at 5, I am unpersuaded by Defendant's argument. Under the law, Officer Bolstad was not required to be specifically familiar with *Lyons* to rely on it, if the officer "acted in strict compliance with then-binding Circuit law." *Robinson*, 903 F.Supp.2d at 805; *see also Amaya*, 853 F.Supp.2d at 829 ("Lower courts, accordingly, when applying *Davis*, have looked to officers' compliance with, not knowledge of, binding appellate precedent."). Here, Officer Bolstad strictly complied with *Lyons*, as Officer Bolstad did not engage in police misconduct and if Mako inserted his nose through the open window—which he did not—Mako's actions were instinctual. 486 F.3d at 373 ("Absent police misconduct, the

instinctive actions of a trained canine do not violate the Fourth Amendment."); *see also Handley*, 186 F.4th at 569-70.

Accordingly, I recommend that the Court deny Defendant's motion to suppress on this issue.

### ***D. Defendant's Statements to Law Enforcement***

#### ***1. Statements made after the August 2025 and June 2026 traffic stops***

##### ***a. Relevant law***

Evidence obtained as a result of an unconstitutional search or seizure must be suppressed as well as any evidence later discovered to be an illegal "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). "Any evidence secured through an unreasonable, hence illegal, search and seizure may not be used in a federal prosecution, nor may the fruit of such tainted evidence be admitted against the defendant whose privacy rights were originally violated." *United States v. Conner*, 948 F. Supp. 821, 829 (N.D. Iowa 1996) (citing *Weeks v. United States*, 232 U.S. 383 (1914); *Wong Sun*, 371 U.S. at 484-88). "Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search." *United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011) (quoting *United States v. Yousif*, 308 F.3d 820, 832 (8th Cir. 2002)). "Though evidence seized in violation of the Fourth Amendment is subject to exclusion in a criminal prosecution, '[e]vidence should not be excluded . . . unless the illegality is at least a but-for cause of obtaining the evidence.'" *United States v. Class*, 883 F.3d 734, 738 (8th Cir. 2018) (alteration in original) (quoting *United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007)). Initially, the burden falls on the defendant to establish a "'factual nexus between the constitutional violation and the challenged evidence.'" *Id.* (quoting *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007)).

### *b. Application*

Here, Defendant seeks to suppress statements by the officers and by Defendant as "fruit of the poisonous tree." There are multiple difficulties with this argument. First, as discussed above, I find that law enforcement had probable cause to search Defendant's vehicle on August 6, 2025 and June 11, 2026. Thus, there is no poisonous tree or trees to bear fruit. Second, Defendant offers no specificity as to any statement or statements that he believes should be suppressed. Third, Defendant was advised of his *Miranda* rights on both August 6, 2025 and June 11, 2026. *See* Gov. Ex. 2 at 20:02:20-20:02:32; Gov. Ex. 5B at 1:30:13-1:30:30. Fourth, because the traffic stops and searches were not illegal, and it appears from the evidence, which Defendant has failed to set out in any specificity, that any incriminating statements made by Defendant were made after he was advised of his *Miranda* rights, Defendant has failed to meet the requirement of demonstrating a sufficient factual nexus between the constitutional violation and the challenged evidence. *See United States v. Yorgensen*, 845 F.3d 908, 913 (8th Cir. 2017) (citation omitted). Accordingly, I recommend that Defendant's request to have statements that he made after the traffic stops on August 6, 2025 and June 11, 2026 suppressed be denied regardless of whether the Court agrees with me regarding the existence of reasonable suspicion and/or probable cause to stop and search Defendant's vehicle.

### *2. Statements made on June 30, 2026 to S.A. Austin*

### *a. Relevant law*

"The familiar *Miranda* rule provides as a general matter that investigators must communicate warnings to a suspect before conducting a custodial interrogation." *United States v. Armstrong*, 39 F.4th 1053, 1056 (8th Cir. 2022); *see also United States v. Jones*, 842 F.3d 1077, 1082 (8th Cir. 2016) ("The Fifth Amendment requires suspects to be informed of their *Miranda* rights before any custodial interrogation."). "*Miranda* warnings are required only when a person is in custody, because they are intended to

‘protect the individual against the coercive nature of custodial interrogation.’” *United States v. Soderman*, 983 F.3d 369, 376 (8th Cir. 2020) (quoting *United States v. Thomas*, 664 F.3d 217, 222 (8th Cir. 2011), in turn quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011)). “Interrogation, for *Miranda* purposes, means ‘express questioning’ and ‘words or conduct that officers should know [are] ‘reasonably likely to elicit an incriminating response from the suspect.’” *Jones*, 842 F.3d at 1082 (alteration in original) (quoting *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004), in turn quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). “A person is considered to be in custody for the purposes of *Miranda* warnings when there is a ‘formal arrest or restraint [on his or her] freedom of movement of the degree associated with formal arrest.’” *United States v. Sandell*, 27 F. 4th 625, 628-29 (8th Cir. 2022) (quoting *United States v. Parker*, 993 F.3d 595, 601 (8th Cir. 2021)).

“During an interrogation, ‘[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.’” *United States v. Adams*, 820 F.3d 317, 322-23 (8th Cir. 2016) (alteration in original) (quoting *Miranda v. Arizona*, 384 U.S. 436, 473–74 (1966)); *see also Jones*, 842 F.3d at 1083 (“Officers must stop questioning if a suspect clearly and consistently expresses a desire to remain silent.”). “‘To adequately invoke this right and effectively cut off questioning, a suspect must indicate “a clear, consistent expression of a desire to remain silent.”‘” *Adams*, 820 F.3d at 323 (quoting *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995), in turn quoting *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir. 1989)). “Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right to remain silent are not enough to invoke that right for purposes of *Miranda*.” *United States v. Ferrer-Montoya*, 483 F.3d 565, 569 (8th Cir. 2007). A defendant’s statements are considered “as a whole to determine whether they indicate an

unequivocal decision to invoke the right to remain silent." *Adams*, 820 F.3d at 323 (quotation omitted).

A defendant may waive his or her right to remain silent and such waiver "'can be clearly inferred from the actions and words of the person interrogated.'" *Id.* (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). "A valid *Miranda* waiver must be 'made voluntarily, knowingly and intelligently.'" *United States v. Denby*, 182 F.4th 744, 751 (8th Cir. 2026) (quoting *United States v. Pierson*, 73 F.4th 582, 590 (8th Cir. 2023), in turn quoting *Miranda*, 384 U.S. at 444). There are two inquiries when determining whether a defendant "voluntarily, knowingly, and intelligently waived his [or her] *Miranda* rights." *United States v. Kucera*, 186 F.4th 1054, 1060 (8th Cir. 2026). "First, the waiver must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "[s]econd, the suspect must have waived his [or her] rights with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quoting *United States v. Rooney*, 63 F.4th 1160, 1168 (8th Cir. 2023)). "'Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.'" *Adams*, 820 F.3d at 323 (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010)).

A statement is involuntary when it is extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Sandell*, 27 F.4th at 630 (quoting *United States v. Roberts*, 975 F.3d 709, 718 (8th Cir. 2020)). In determining whether a defendant's will has been overborne, courts examine the totality of the circumstances, "'including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure.'" *Id.* (quoting *United States v. Magallon*, 984

F.3d 1263, 1284 (8th Cir. 2021)). Factors for making this determination include "'the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition.'" *Magallon*, 984 F.3d at 1284 (quoting *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011)). "A statement is not considered involuntary unless 'the police extorted it from the accused by means of coercive activity.'" *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) (quoting *Jenner v. Smith*, 982 F.2d 329, 333 (8th Cir. 1993)). "[T]actics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices," do not "render a confession involuntary . . . unless 'the overall impact of the interrogation caused the defendant's will to be overborne.'" *Magallon*, 984 F.3d at 1284 (quoting *United States v. Brave Heart*, 397 F.3d 1035, 1041 (8th Cir. 2005), in turn quoting *Jenner*, 982 F.2d at 334).

***b. Application***

On June 30, 2026, Det. Berry initially encountered Defendant at 6:41 p.m. (Gov. Ex. 7 at 18:41:45.) Law enforcement was at Defendant's residence to arrest Defendant and execute a state search warrant. Upon his arrival at Defendant's residence, Det. Berry found Defendant sitting in the driver's seat of a black vehicle. Det. Berry first asked about the presence of people or guns in the house. (*Id.* at 18:41:59-18:42:05.) Det. Berry opened the door of the vehicle and requested Defendant exit. Det. Berry, with the assistance of another officer, handcuffed Defendant after he exited the vehicle. (*Id.* at 18:42:13-18:42:44.) Defendant was asked questions about the contents of his pockets and who was in the residence while he was searched. Det. Berry walked Defendant to the back door of the residence with other officers while they discussed, primarily, the presence of Defendant's son and a dog inside and tried to induce Defendant's son to come

to the door. Det. Berry advised Defendant of his *Miranda* rights at 6:46 p.m. (*Id.* at 18:45:40-18:45:56; Berry Hr'g Test. at 79.) Det. Berry asked if Defendant understood his rights. (*Id.* at 18:45:50.) At this point, Defendant appeared to make a slight shrug, and Det. Berry repeated his inquiry. Det. Berry testified:

> Q. Did you observe Mr. Denton give you a nonverbal response when you advised him of his *Miranda* rights?
> A. I think he was well aware of what I read him. I don't recall if he, like, nodded his head or anything like that. But I didn't get the impression that he had any questions about what I just advised him of.

(Berry Hr'g Test. at 86.)

S.A. Austin did not personally advise Defendant of his *Miranda* rights, but he understood another officer had done so. (Austin Hr'g Test. at 51; Berry Hr'g Test. at 79.) S.A. Austin described how he bought Defendant food because Defendant had not eaten and S.A. Austin was concerned for his well-being. S.A. Austin's body camera footage appears to begin with him handing Defendant this food at approximately 7:39 p.m. (Gov. Ex. 8.) S.A. Austin transported Defendant from Waterloo to the Linn County Jail after approximately 45 minutes to an hour after law enforcement first encountered Defendant at the scene of the arrest. (Austin Hr'g Test. at 52, 57.)

In *United States v. Ferrer-Montoya*, 483 F.3d 565 (8th Cir. 2007) (per curiam), the defendant was stopped for speeding on the interstate. *Id.* at 567. With suspicions aroused based on the defendant's illegal immigration status, lack of title, proof of insurance, and vague and inconsistent travel plans, law enforcement sought permission to search the vehicle. *Id.* The defendant provided both verbal and written consent to search the vehicle. *Id.* A drug sniffing dog did not alert on the vehicle, but a physical search of the vehicle revealed a hidden compartment containing packages of methamphetamine. *Id.* The defendant was placed under arrest, read his *Miranda* rights, and given a written copy of his rights in Spanish. The defendant indicated that he

understood his rights. *Id.* The arresting officer asked the defendant if he wanted to tell him anything and the defendant responded that he had told the officer about his travel plans and said, "What else can I say?" *Id.* The officer did not engage in further interrogation regarding narcotics. *Id.* at 567-68. The defendant was transported to a nearby Highway Patrol Post. At the Highway Patrol Post, two state narcotics agents met the defendant. The arresting officer informed the agents that he had *Mirandized* the defendant about one hour earlier which the defendant acknowledged. *Id.* at 568. The defendant then cooperated and answered substantive questions from the agents. *Id.*

The defendant moved to suppress the methamphetamine and his statements to the agents. *Id.* On appeal, the Eighth Circuit noted that "[i]t is uncontested that [the arresting officer] read [the defendant] his *Miranda* rights, that [the defendant] understood them, and that [the defendant] was not receptive to [the arresting officer's] initial offer to talk about the drugs. *Id.* at 569. The Eighth Circuit determined that the agents' failure to re-read *Miranda* warnings to the defendant "did not require exclusion of his later statements to them." *Id.* The Eighth Circuit explained that:

> Only one hour had passed since [the arresting officer] read the *Miranda* warnings to [the defendant] in full, and [the defendant] told [the agents] that he had been read his rights and understood them. Moreover, there is no evidence of any event in that intervening hour that would lead us to conclude that the warnings provided by [the arresting officer] had gone stale or needed full reiteration: [the defendant] was in police custody the entire time, he does not allege any coercive conduct by the police, and, as stated above, he did not invoke his *Miranda* rights. Under the circumstances, [the agents] did not need to fully re-state the *Miranda* warnings prior to their interrogation of [the defendant].

*Id.* at 569-70; *see also United States v. Nguyen*, 608 F.3d 368, 375 (8th Cir. 2010) (noting that "a delay up to six and a half hours between *Miranda* warnings and interrogation of an intelligent and articulate adult who had significant experience with the

criminal justice system did not render the waiver of *Miranda* rights ineffective") (citing *Stumes v. Solem*, 752 F.2d 317, 320 (8th Cir. 1985)).

Defendant relies on an out-of-circuit case, *United States v. Pruden*, 398 F.3d 241 (3d Cir. 2005) for the argument that the *Miranda* warning given by Det. Berry did not carry over to the questioning by S.A. Austin on the drive from Waterloo to Cedar Rapids. The issue may be resolved under Eighth Circuit law, and I will not apply the test set forth in *Pruden*.

Here, Defendant was *Mirandized* slightly less than an hour before S.A. Austin began the transport of Defendant from Waterloo to Cedar Rapids. Det. Berry advised Defendant of his *Miranda* rights, asked Defendant if he understood his rights, and Defendant made a slight shrug in response. (Gov. Ex. 7 at 18:45:40-18:45:56; Berry Hr'g Test. at 79.) At the hearing, Det. Berry testified that Defendant "was well aware of what I read him" and "I didn't get the impression that he had any questions about what I just advised him of." (Berry Hr'g Test. at 86.) S.A. Austin did not personally advise Defendant of his *Miranda* rights, but he understood that another officer had done so and Det. Berry testified that he told S.A. Austin that he had *Mirandized* Defendant. (Austin Hr'g Test. at 51; Berry Hr'g Test. at 79.) Defendant had also been advised of his *Miranda* rights on August 6, 2025 and June 11, 2026. I note that when he was *Mirandized* on June 11, 2026, Defendant acknowledged that he understood his rights. *See* Gov. Ex. 5B at 1:30:13-1:30:30. S.A. did not threaten Defendant, assault or act in violence toward Defendant, and did not express or imply promises "sufficient to overbear" Defendant's will and critically impair his capacity for self-determination." *Sandell*, 27 F.4th at 630; Gov. Ex. 8. Defendant presents no evidence that he was under duress, coerced, or threatened when questioned by S.A. Austin, which is consistent with S.A. Austin's body camera footage. (Gov. Ex. 8.) Furthermore, Defendant did not invoke his right to remain silent during the ride from Waterloo to Cedar Rapids.

Under the totality of the circumstances, I find that Defendant waived his rights under *Miranda*. Thus, S.A. Austin's questioning on June 30, 2026 did not constitute a Constitutional violation. *See Adams*, 820 F.3d at 323 ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.") (Quotation omitted). The lapse of time of slightly less than an hour between Det. Berry *Mirandizing* Defendant and S.A. Austin questioning Defendant was not so long as to require S.A. Austin to re-*Mirandize* Defendant before questioning him. *See Ferrer-Montoya*, 483 F.3d at 569-70 (finding that one hour between being *Mirandized* and questioning by different officers than the *Mirandizing* officer was not a Constitutional violation of the defendant's rights); *Nguyen*, 608 F.3d at 375 ("[A] delay up to six and a half hours between *Miranda* warnings and interrogation of an intelligent and articulate adult who had significant experience with the criminal justice system did not render the waiver of *Miranda* rights ineffective.") (Citation omitted). Moreover, like in *Nguyen*, there is no evidence that Defendant is something other than a reasonably intelligent adult with experience with the criminal justice system. Therefore, based on the foregoing, I find that Defendant's statements to S.A. Austin on June 30, 2026 should not be suppressed because Det. Berry's *Miranda* warnings slightly less than an hour before S.A. Austin's questioning had not grown stale.

Accordingly, I recommend that the court deny Defendant's motion to suppress on this issue.

## *IV. CONCLUSION*

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 31.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of

the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 9th day of November, 2026.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa